IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

MATTHEW J. WEBER and
HEIDI WEBER,

                              Plaintiffs,                          OPINION AND ORDER

        v.                                                         21-cv-300-wmc

PIERCE COUNTY WISCONSIN
DEPARTMENT OF HUMAN SERVICES,
MICHELLE HARRIS, JENNELLE WOLF,
RON SCHMIDT, CITY OF FRIDLEY, MN
POLICE DEPARTMENT, BRIAN J.
DESJARDINS, STEPHANIE OLSEM, and
KIM STENSLAND,

                              Defendants.

---

*Pro se* plaintiffs Matthew Weber and Heidi A. Weber claim that defendants violated their constitutional and state statutory rights by facilitating and continuing the removal of plaintiffs' then-minor daughter, JKW, from their Pierce County, Wisconsin home.  Before the court are:  (1) plaintiffs' "motion to produce" certain audio evidence (dkt. #90), which actually amounts to a motion to bar most of that evidence as inadmissible; and (2) the parties' cross-motions for summary judgment (dkt. ##51, 61, 72).  This case might be closer if it concerned temporary placement of an infant, toddler or even young adolescent, but it involves a nearly fully emancipated seventeen and a half year old, who was articulate enough to describe both concerns about her parents' conduct and her own physical and mental well-being, making it hard to find *any* fault with county or city protective services between negotiating JKW's expressed desire for temporary placement outside her parents' home, to which plaintiffs' had at least initially voluntarily agreed, and the holding a formal

hearing before a county circuit court judge just two and a half weeks later, especially since that judge also agreed with protective services that JKS's continued placement outside the plaintiffs' home was appropriate until she reached the age of eighteen, which occurred approximately four months later.  Indeed, without in any way minimizing the turmoil the Weber family as a whole experienced over several months, plaintiffs' claims against the individual Pierce County defendants are barred on three, separate grounds -- issue preclusion, the *Rooker-Feldman* doctrine, and absolute immunity.  Accordingly, the court will deny plaintiffs' motion to compel and grant defendants motions for summary judgment.

## MOTION TO PRODUCE

Plaintiffs' motion to produce challenges the authenticity of an audio recording of Pierce County Child Protective Services' initial visit to plaintiffs' home, which must be authenticated before the court may consider it on summary judgment.[1]  Pierce County Sheriff's Deputy Thomas Bauer attests to having recorded the visit on his work cellular phone as he accompanied defendant Michelle Harris, a Pierce County Human Services Department ("the Department") Initial Assessment Worker, during Harris's initial visit with the Webers in April 2020.  Before filing this lawsuit, the Sheriff's Office provided plaintiffs with a copy of the recording in response to an open records request.  After filing this lawsuit, plaintiffs also obtained another copy of the recording in response to a discovery request.  By motion, plaintiffs now assert that the recording has been edited and

---

[1] A partial transcription of this recording has been docketed by defendants.  (Dkt. #53-3.)

ask the court to deem it inadmissible, save for the portion capturing Harris's interview with their daughter, JKW.

The court will deny the motion. Audio recordings are "generally admissible as evidence whether in original or duplicate form." *Smith v. City of Chi.*, 242 F.3d 737, 741 (7th Cir. 2001). The party seeking to authenticate an audio recording in a civil proceeding must do so by "clear and convincing evidence." *See id.* (assuming the "clear and convincing" evidentiary standard applicable in criminal proceedings would also apply to a civil case). A party may do so by either showing the chain of custody *or* by establishing the accuracy and trustworthiness of the audio recording by other means. *Id.* at 741-42. For example, participants to the conversation or others who heard it can sufficiently authenticate an audio recording through affidavits or testimony. *Id.* at 742. After the proponent demonstrates that the audio recordings are authentic, the burden then shifts to the opponent to rebut that showing. *Id.*

Defendants have submitted both types of authentication evidence here. As for the chain of custody, Deputy Bauer attests he transferred the recording from his work phone to a disk on May 4, 2020, then removed the recording from his work phone, which he no longer has. (Dkt. #102 at 3.) Bauer then gave a copy of the disk to the department *and* placed the original disk in the Pierce County Sheriff's Office records room under lock and key, to which only one other deputy and he had access. (*Id.*) That other deputy also attests that she made a copy of the disk on February 16, 2021, in response to plaintiffs' open records request, as well as that the duplicator she used did not allow her to view, edit or alter the disk. (Dkt. #107 at 2.) Defendant Harris further attests to receiving a copy

of the disk on May 4 and placing that copy in the plaintiffs' child protective services file. (Dkt. #101 at 2.)  As for the recording's accuracy and trustworthiness, Bauer and Harris identify their own voices, as well as the voices of plaintiffs, their daughter, and their daughter's boyfriend.  (Dkt. ##101 at 2, 102 at 4.)

While plaintiffs identify several problems with the recording, they do not begin to justify suppressing it in light of defendants' overwhelming proof of authenticity.  For one, plaintiffs note that the recording file shows a "date modified" of May 4, 2020, but that is simply the date Bauer copied the file from his phone to a disk.  Plaintiffs also opine that some 15 to 18 minutes of the recording must have been edited out based on an "unaccounted time gap" between when Harris told plaintiffs she would make a phone call and when Harris actually made the call.  (Dkt. #91 at 4.)  However, plaintiffs base that opinion on nothing more than their own, suspect recollection of what Harris actually said about the timing of her phone call.  (Dkt. #53-3, Ex. B, 1:37:22-1:37:31.)  Similarly, plaintiffs argue that certain statements they recall are now missing from the recording, but as defendants respond, a more persuasive explanation is that those statements were either not made at all *or* similar statements were made at other times, as reflected in the record. (Dkt. #97 at 12-14.)  Finally, plaintiffs note that:  (1) they are heard saying things they "would never say";  (2) there is an unidentified "beeping" noise in the background at some point, which they speculate defendants caused to help "fool some edit detecting software"; (3) some of their words or statements trail off, even though plaintiffs recall being in close proximity during the entire visit; and (4) Mrs. Weber and Harris can be heard "cut[ting] each other off," which is also a way of "covering splicing/edits."  (Dkt. #91 at 3-4.)

Plaintiffs' lay conjecture about what these "hallmark signs" mean and their own recollection of what occurred during the visit is not *evidence* of tampering, and provide no credible basis for this court (or a reasonable jury) to find that a nondefendant investigator or anyone else tampered with the recording before plaintiffs actually filed suit. (*Id.* at 3.)

In reply, plaintiffs attempt to change tack by raising new suspicions regarding the way the file is named and offering metadata they claim to have extracted from the audio recording file via an open-source website. However, a reply is for replying, not for making new arguments or presenting new evidence that could have been advanced in their original motion and supporting materials. *See United States v. Foster*, 652 F.3d 776, 787 n.5 (7th Cir. 2011) (declining to consider arguments raised for the first time in reply). Moreover, neither plaintiff is qualified as an expert in extracting and analyzing metadata from audio files. At bottom, plaintiffs' general beliefs and suspicions about the recording based on what they remember or hear now, much less their lay interpretation of metadata are not enough to overcome defendants' evidence of authenticity. Accordingly, the court will deny plaintiffs' motion and consider the audio recording and its transcription at summary judgment.

UNDISPUTED FACTS[2]

**A. The Parties**

The Webers are proceeding against two sets of defendants. The Pierce County defendants include its Human Services Department and director Ronald Schmidt, as well

---

[2] The court draws these undisputed facts from the parties' own proposed findings of fact, as well as the underlying evidence, including audio and video evidence as appropriate. Notably, plaintiffs respond to most of defendants' proposed findings of fact largely with argument, additional

as the Department's Initial Assessment Worker Michelle Harris, Ongoing Social Worker Stephanie Olsem, Lead Social Worker Kim Stensland, and Child Protection Supervisor Jennelle Wolf.  The City of Fridley defendants include the Fridley Minnesota Police Department and one of its police officers, Brian J. Desjardins.

### B. Pierce County Initial Assessment Worker Harris and Deputy Inspector Bauer's Visit to the Weber Home on April 30, 2020.

The Department received a child protective service report on April 22, 2020, alleging that JKW had seen her mother "doing drugs in the garage" two days earlier.  (Dkt. #63-1 at 2.)  Specifically, Mrs. Weber reportedly was "bent over a desk," "snorting something," and told JKW that "it was her rock collection."  (*Id.*)  JKW reportedly also saw "white residue on the desk," but when she asked her father about the incident, he did not reply.  (*Id.*)  JKW further reportedly found "crystals in a small plastic container" earlier in the school year that purportedly belonged to her mother.  (*Id.*)  Finally, JKW expressed the belief that her parents "have a negative view of her," would lead a "different lifestyle" without her, and acted like she was "in the way."  (*Id.*)  At that time, the Department "screen[ed] in" the report, the veracity of which the Webers dispute, and out of "concern

---

unsupported or immaterial proposed facts, or unnecessary clarifications (*e.g.*, dkt. #137, response to ¶¶ 9, 9a), and also frequently assert hearsay objections to statements that are not presented as proof of the matter asserted (*e.g.*, dkt. #137, response to ¶ 8b).  These responses not only contravene the court's summary judgment procedures, but they fail to raise genuine, factual disputes.  Accordingly, as appropriate, the court has ignored argumentative responses and will deem these proposed facts to be undisputed.  As for plaintiffs' proposed findings, many contain multiple factual propositions without citation to *any* record evidence.  (*E.g.*, dkt. #75 at ¶¶ 1-49.)  Even giving plaintiffs some leeway as *pro se* litigants, the court will not search the voluminous record in this case for evidence or make unreasonable inferences on plaintiffs' behalf and must disregard unsupported facts.  Thus, unless otherwise indicated, the following recitation of facts are material, supported by record evidence, and not genuinely disputed.

for illegal drug use in the home," determined that an assessment was warranted.  However, because JKW was seventeen and a half years old with no noted vulnerability, the department also determined that assessment did not need to be conducted immediately. (*Id.* at 4.)

Eight days later, on April 30, 2020, Pierce County Initial Assessment Worker Harris and Deputy Inspector Bauer went to the Weber home for a scheduled visit concerning the report.  As already discussed above, Bauer captured an audio recording of the visit, portions of which have been transcribed, although the Webers maintain the recording is inconsistent with their own recollections of events and what was said.  Harris and Bauer went into JKW's room to speak with her and her boyfriend first.  (Dkt. #53-2, Ex. B, 0:08-0:50.)  JKW disclosed that she had just had surgery for appendicitis then stated that she thought her mother was "using" "something like . . . cocaine or meth," while conceding that she did not know much about "hard drugs."  (*Id.* at 2:01-2:12, 4:05-4:22.)

Still, JKW continued, she had found a "white and crystally" substance in the bedroom, the garage, and JKW's bathroom, which her mother had claimed belonged to a neighbor.  (*Id.* at 4:23-5:24.)  Moreover, JKW reported that:  her mother had "been a lot different" over the past couple of years; she had missed or been late to many of JKW's school and extracurricular events; and her mother's nails had become "gross" and had "burns."  (*Id.* at 5:43-6:56.)  JKW's boyfriend agreed that JKW's parents had changed, noting that they now blamed JKW for everything, hardly ever came to JKW's dance competitions and similar events, and had not done "anything to help" after JKW's surgery. (*Id.* at 8:40-9:30.)  The boyfriend further reported that JKW saw white powder on a table

in the garage, but said that Mrs. Weber covered the powder with a piece of paper when asked about it and tried to avoid answering questions. (*Id.* at 9:31-10:36.)

JKW then pivoted back to her surgery, stating that her mother had left her alone at the hospital overnight, and JKW was "nervous" to leave her father alone, revealing that he had just had a stroke. (*Id.* at 11:10-12:40.) JKW clarified that while she did not think her father was using drugs and there was no physical abuse, she had suffered "neglect" and her parents "said mean things." (*Id.* at 12:47-13:34.) For example, JKW reported that her mother had said "F you" and "I hate you" to JKW, and that she could not wait until JKW moved out and went to college, because her life would be better without JKW in it. (*Id.* at 13:42-14:19.) JKW also noted that her older sisters had "cut off ties" with their parents, and later stated that her eldest sister's grandmother had tried to take custody of her granddaughter, claiming the Webers were abusive. (*Id.* at 14:20-14:53, 19:58-20:46.) If it was not possible to live with her father and have her mother go to rehab, JKW expressed a preference to live with her eldest sister in Fridley, Minnesota. (*Id.* at 15:13-16:30.) JKW also stated that she believed her father knew what was going on with Mrs. Weber. (*Id.* at 18:35-19:00.)

After Harris and Bauer left JKW's room to speak with the Webers, Harris explained "there was an allegation made with some concerns for parenting that related to drug use." (*Id.* at 22:35-22:54.) Mrs. Weber responded by recounting how she had lost weight in preparation for her appearance on a television show about her involvement in a whistleblower case, which caused their older daughters to begin making "these different allegations against" her. (*Id.* at 24:53-27:09.) Mrs. Weber also stated that in 2018 her

eldest daughter in front of friends and family had asked her to take a drug test on Thanksgiving Day, but Mrs. Weber refused.  (*Id.* at 30:47-32:04.)  She continued that Mr. Weber recently suffered a stroke, and that their two, older daughters had taken over their grandmother's estate and removed the Webers from her will.  (*Id.* at 28:26-29:20.)  Amidst this turmoil, Mr. Weber suggested that JKW was "playing like one side against the other . . .to gain attention," and Mrs. Weber added that JKW also "wants to fit in with her sisters."  (*Id.* at 29:45-30:14.)  Plaintiffs proceeded to describe their efforts to reconcile with the older children.  (*Id.* at 30:15-36:35.)

When Inspector Bauer asked Mrs. Weber whether she had ever used illegal drugs, she acknowledged having used marijuana and had tried what she thought was cocaine once in college, had tried acid when she was 19, and had last used marijuana five or six years ago.  (*Id.* at 38:02-16, 43:22-44:42.)  At the same time, the Webers declined to take a drug test, and said they had passed a drug test in the past.  (*Id.* at 46:22-47:51.)  Mr. Weber also claimed that they had protected their children from the more difficult aspects of life, but he and his wife had agreed even before the home visit that if JKW were removed, "we will pack her bags and let her go."  (*Id.* at 47:58-49:08.)  Mrs. Weber then told Harris about a police report concerning a dispute between her and JKW during which JKW threatened Mrs. Weber physically.  (*Id.* at 49:08-50:29.)  When Harris next asked if there was a place JKW could stay while she completed her investigation, Mrs. Weber responded "sure," "[y]ou can take her anywhere" and Mr. Weber agreed, saying that JKW needed to learn what life outside her family home would be like.  (*Id.* at 51:01-51:22.)  Mrs. Weber then suggested JKW stay with her boyfriend's family where she already frequently stayed,

and who were "great people," while Mr. Weber suggested in the alternative that JKW stay with her sister.  (*Id.* at 51:23-52:21.)  Mr. Weber then briefly discussed their custody dispute with their eldest daughter's grandmother, and the Webers added how stressful the whistleblower case had been.  (*Id.* at 52:45-54:10.)

After some additional discussion, Harris explained that the concern at that time was the allegation of drug use, and because she could not conclude with certainty that there was no drug use going on in the house, she needed to contact her supervisor and come up with a plan to continue speaking with the Webers while ensuring JKW's safety.  (*Id.* at 56:56-57:48.)  The Webers then took Harris and Bauer around the home before they met JKW and her boyfriend outside.  While Harris spoke with her supervisor, JKW's boyfriend told Bauer that he was uncomfortable with JKW staying with her parents, that JKW's parents "hardly feed her," and his parents would take in JKW for "a little bit."  (*Id.* at 58:57-1:04:36, 1:05:22-1:06:46.)   After Harris rejoined Bauer, Bauer explained the boyfriend's concerns to Harris, and JKW reiterated her preference to go to her sisters' home, stating that she was able to drive safely as she had not taken any pain medication for "about 12 hours."  (*Id.* at 1:18:13-1:19:53.)

After everyone returned inside the Webers' home, Harris explained that she had spoken with her supervisor and needed to gather more information about the family.  (*Id.* at 1:20:11-1:20:22.)  Mrs. Weber noted that she felt like a "case" was being built against the Webers.  (*Id.* at 1:20:22-1:20:33.)  Harris again suggested a drug test, and Mrs. Weber explained in response that:  JKW has epilepsy; the family had tried counseling; and taking a drug test would not solve any of their longstanding problems.  (*Id.* at 1:20:33-1:21:44.)

Even so, the Webers agreed that it would be "good" for JKW to stay somewhere else for a period of time.  (*Id.* at 1:22:06-1:22:18.)  The Webers further agreed that JKW could stay with her sisters, and that both sisters could be part of the protective plan for JKW.  (*Id.* at 1:22:18-1:23:20.)  Harris explained that the "protective plan" was an "agreement" stating that "for the time being, while [Initial Assessment Worker Harris] continue[d] to make [an] assessment," JKW would stay with her sisters and the plan could be "retract[ed]" at any time.  (*Id.* at 1:27:00-1:27:14, 1:30:36-1:31:07.)  Initially, Mr. Weber refused to sign off on the plan, suggesting that JKW should just go into protective custody, and that JKW could make her own decisions.  (*Id.* at 1:27:19-1:27:43.)  Harris then reminded the Webers that they still had parental rights, and Mrs. Weber remarked that she no longer felt that she did.  (*Id.* at 1:27:30-1:27:36.)  Harris continued to explain the plan, and when Mr. Weber again declined to sign, Harris stated that she did not want to take JKW into protective custody.  (*Id.* at 1:27:44-1:29:22.)  Deputy Bauer explained that the Webers could either voluntarily let JKW go or JKW could be placed in protective custody, but that under a voluntarily plan, the Webers could later "rescind [their] signature" and require the Department to go through the courts.  (*Id.* at 1:31:08-1:31:32.)  JKW confirmed that she wanted to stay with her sisters or her boyfriend's family.  (*Id.* at 1:32:08-1:32:22.)  Although Mrs. Weber expressed concern about JKW staying with her sisters, the Webers signed the plan after further discussion.  (*Id.* at 1:32:28-1:35:10.)

At that point, having already toured the home and observing no drugs, *and* Mrs. Weber having denied that Bauer would find anything if he searched the home more thoroughly, Deputy Bauer explained that it was not his role to say whether the allegations

amounted to "neglect" or not.  (*Id.* at 1:35:48-1:36:08.)  Rather, his concern was whether a crime had occurred and whether anyone needed help, and finding neither, Bauer said he was "going to end up closing [his] end of it out" and would not reopen his file unless there was a positive drug test or some relevant court order.  (*Id.* at 1:36:09-1:37:15.)  As for Initial Assessment Worker Harris, she concluded the visit by indicating her plan to "be in contact" with the Webers the next day, and with the Webers' older daughters "to make sure that they're okay with [JKW] coming to their house before she goes there."  (*Id.* at 1:37:16-1:37:32.)   As JKW prepared to leave, Mrs. Weber asked JKW about her medications, who indicated that she had them and did not need her pain medications anymore.  (*Id.* at 1:38:36-1:38:56.)[3]

### C.  Pierce County Initial Assessment

After leaving, Harris also contacted JKW's oldest sister, who agreed to have JKW stay with her under the protective plan and "expressed significant concern for JKW should she remain in the Webers' care."  (Dkt. #64 at 3.)  Pierce County Lead Social Worker Kim Stensland attests that she agreed with Harris that a protective plan "was the best course of action" for the Webers, and signed that plan as a supervisor.  (Dkt. #67 at 1.)

However, five days later, on May 4, 2020, Mrs. Weber apparently had a change of heart and sent an email to Pierce County Human Services Department Director Ron Schmidt, explaining the family's past and recent stresses, as well as asserting that Harris

---

[3] While the Webers dispute the truth of the assertions made by JKW and her boyfriend during Deputy Bauer's and Initial Assessment Worker Harris's April 30th visit, and also allege that JKW's sister's home was not a safe environment for JKW, they do not dispute their signing the plan permitting JKW to stay with her sister.

had pre-judged them, put JKW in danger, and forced the Webers into agreeing with a protective plan.  (Dkt. #63-2.)  Director Schmidt attests that he reviewed the email with Child Protection Supervisor Jennelle Wolf and asked her to coordinate a response to the Webers.  (Dkt. #68 at 1.)  Wolf attests that she then reviewed the email with Initial Assessment Worker Harris and Deputy Bauer, concluded that it was unnecessary to replace Harris, and instructed Harris to respond to Mrs. Weber's concerns.  (Dkt. #66 at 1-2.) Harris responded that same day, advising the Webers that:  the initial assessment was ongoing; it could be resolved quickly if the Webers would take a hair follicle drug test; and as contemplated in the protective plan, JKW was staying with her oldest sister.  (Dkt. #63-7.)

Also on May 4, and continuing over the next several days, Harris attests that JKW stayed in contact with her and was raising concerns about messages JKW was receiving from Mrs. Weber.  (Dkt. #64 at 4.)  Harris attests that she advised JKW not to respond to at least one of these messages for the time being.  (*Id.*)  When JKW expressed concern about her parents coming to a scheduled doctors visit at a local hospital, Harris further advised JKW to ask that her primary contact number be changed to her own cell phone, although ultimately the hospital was unable to change that information.  (*Id.*)  Harris attests that JKW next shared with her that Mr. Weber had reportedly gone to her boyfriend's parents' house to retrieve her, thinking JKW was there, but was unsuccessful since JKW was not there.  (*Id.*)  During this time, Harris was also trying to schedule a meeting with the Webers, Deputy Bauer and her, but on May 11, Harris attests that Mrs. Weber told Harris that their attorney had advised that they did not need to meet with

13

either Harris or Bauer.  (*Id.* at 4-5.)  Although Harris responded that she wanted to come to the Weber home with Bauer to meet with the Webers and to pick up some of JKW's belongings, Harris attests that Mrs. Weber again refused to meet, and instead asked Harris to "make sure" JKW returned her phone to the Webers.  (*Id.* at 5-6.)

As her initial assessment continued, Harris attests that she also continued to receive additional information from JKW, her sisters, her boyfriend's parents, and one of her teachers, all of whom corroborating allegations of "verbal abuse" and "neglect" by the Webers of their daughter.  (*Id.* at 6.)  Finally, JKW also sent Harris photos of what "appeared to be illicit drugs and illicit drug paraphernalia in the Weber family home," although the Webers dispute that the photos are of illicit drugs.  (*Id.*)  According to Harris, however, the Webers never contacted her about cancelling the protective plan.

### D.   Mr. Weber's Attempt to Retrieve JKW from Fridley, Minnesota

Roughly on May 11, 2020, Mr. Weber arrived unannounced at his eldest daughter's home around 8:40 p.m., ostensibly to retrieve JKW.  When his daughter's husband answered the door and refused to let Mr. Weber take JKW, Mr. Weber proceeded to call the Fridley Police Department.  Officer Desjardins and his partner were dispatched to the home, where Officer Desjardins' body camera captured their encounter with Mr. Weber. (Dkt. #53-8, Ex. G.)

Mr. Weber first asserted that he still had legal custody of JKW and wanted to cancel the voluntary agreement to let JKW stay with her sister, so that he could take her back home.  (Ex. G, Pt. 1, 1:02-1:11.)  Mr. Weber also offered to have Mrs. Weber send photographs of the paperwork for the officers' review, but the officers stated that they

14

would speak with Mr. Weber's older daughter first.  (*Id.* at 1:12-1:51.)  The officers then entered the home and asked JKW why her father was there, prompting JKW to explain that her "social worker" and the "Pierce County cops" were aware of her situation.  (*Id.* at 2:30-2:58.)  As JKW was speaking, her brother-in-law also gave Officer Desjardins a copy of her protective plan.  (*Id.* at 2:58.)  JKW volunteered that someone had reported her parents were "doing drugs," so she was taken out of the home and had been living with her sister.  (*Id.* at 3:38-3:58.)

Officer Desjardins next spoke with Harris over the phone, explaining that Mr. Weber wanted to take JKW home.  (Ex. G, Pt. 2, 1:08-2:57.)  Harris's response is not audible on the video.  In the police report, Desjardins states that Harris "made it sound like the protection plan was a protection hold," advising the officer that it was not safe for JKW to return to her parents' home because her parents were not cooperating with the investigation, and that Harris would call her supervisor now and speak to the parents in the morning.  (Dkt. #53-7 at 1.)  Harris confirmed at her deposition that she told Desjardins that there was a protective plan in place, as well as safety concerns, and she would follow up with the family the next day.  (Dkt. #53-13 at 27.)

While waiting for Harris to call him back, Desjardins explained to JKW that Pierce County would have jurisdiction over the question of her placement, and that the current plan is a "written verbal agreement," meaning that her "social worker" would have to place a "hold" on JKW to stay with her sister.  (Ex. G, Pt. 2, 6:07-6:40.)  A few minutes later, Officer Desjardins also updated Mr. Weber, stating that he was "still waiting for a phone call."  (*Id.* at 19:28-20:00.)  Desjardins then received a phone call from an on-call social

worker, Julie Trok, who indicated that JKW should "absolutely not" go home with her father; in turn, Desjardins responded that the officers had seen the protective plan and would tell Mr. Weber to contact the county, so that it could complete its investigation. (*Id.* at 23:12-24:49.)

After Desjardins informed JKW that the plan was for Harris to call Mr. Weber in the morning, the officers then left the residence to speak with Mr. Weber.  (Ex. G, Pt. 3, 0:08-0:11.)  After being informed that child protective services would not let JKW leave that night, and that he would be contacted in the morning (*id.* at 1:09-1:56), Mr. Weber responded that:  child protective services did not have a legal right to keep JKW from him; the Webers had voluntarily signed the paperwork; and they had also canceled the agreement earlier that day and had been cleared.  (*Id.* at 1:57-2:09.)  However, Officer Desjardins again told Mr. Weber that he would have to take the issue up with Pierce County, who was "saying something completely different," because the county needed to do its investigation and the officers had been told that there has been a "lack of communication" between the Webers and the county.  (*Id.* at 2:48-3:14.)  At that point, Mr. Weber thanked the officers and left.  (*Id.* at 3:11-3:14.)

In his report of the incident, Officer Desjardins notes that he later spoke with Mrs. Weber over the phone, who also wanted JKW returned.  (Dkt. #53-7.)  Desjardins describes Mrs. Weber as argumentative, and so, they "parted ways on the phone" without a resolution.  (*Id.* at 2.)  Desjardins also notes that he followed up with Julie Trok as well, who confirmed that Pierce County had no court order to hold JKW and further explained that Pierce County could not place a hold on JKW because she was now in Anoka County.

The officer contacted Anoka County Child Protective Services ("CPS") for advice, stating that he believed JKW should not go home.  Anoka County CPS notes indicate that its worker deferred to Pierce County's safety concerns and stated that it was up to Desjardins whether to place a hold.  (Dkt. #53-11 at 2.)  Desjardins reports that he confirmed that JKW's sister had no arrest history and completed a 72-hour hold on JKW.

Officer Desjardins further reports that he then returned to JKW's sister's home with his partner to drop off a copy of the protection hold.  There, Desjardins reports that JKW told the officers that she had seen her mother "snorting meth," and described her parents as verbally abusive.  (Dkt. #53-7 at 2.)  JKW further stated that her parents stayed up late, did not sleep, did not clean the home, and probably would not be able to provide food for her.  Desjardins states that these concerns "solidified" his belief that the protection hold was appropriate.  (*Id.*)  He then called the Webers to inform them of the hold, to which his notes indicate the Webers replied they did not want JKW back as all their daughters have caused problems.

The next morning, May 12, a police technician faxed a copy of Desjardins' report, as well as a copy of the hold order, to Anoka County Social Services, who immediately assumed legal custody of JKW.  (Dkt. ##53-11, 53-12.)  That same day, Initial Assessment Worker Harris informed Anoka County that she would be taking JKW back to Wisconsin and placing her into foster care, given that the protective plan "is no longer effective as [the] parents are trying to take her from the sister's home."  (Dkt. #53-1 at 18.)  A representative from Anoka County Social Services also spoke to Mrs. Weber the next day,

May 13, informing her of the police hold.  The following day, May 14, JKW was placed into foster care in Pierce County, Wisconsin.

### E.    Juvenile Proceedings

On May 12, 2020, Mrs. Weber sent a letter addressed to Harris asserting that the investigative process had been unfair to the Webers, recounting the history with their eldest daughter, and more recently, with family stress, and asserting that JKW has not been neglected.  (Dkt. #53-14.)  In addition, Mrs. Weber again directed Harris to "keep" JKW, explaining that she no longer wished to speak to her children, and instead, had to "detach and go on without them."  (*Id.* at 3-4.)  Finally, Mrs. Weber asked that Harris place her letter in the "file," stating that JKW would neither be allowed to keep any items for which the Webers had paid, nor would the Webers pay for JKW's college.  (*Id.* at 4.)

In light of her letter, Harris reached out to Mrs. Weber and scheduled a meeting for May 14 to discuss how best to move forward.  That meeting was held over Zoom and transcribed, and included Jennelle Wolf, the Webers and Harris.  (Dkt. #53-19.)  Harris explained that while Fridley Police had placed a temporary hold on JKW, that hold was no longer in place because Pierce County had subsequently placed JKW in a licensed foster home as of that morning, and there would be a court hearing to address that placement.  Mrs. Weber responded that this was "perfect," and "it'll be good to go get a hearing."  (*Id.* at 3.)  Harris also explained that the Webers could be represented at the hearing, and they would have the right to present evidence and cross-examine witnesses.  Harris further explained that while the initial allegations concerned drug use, and those allegations formed the basis of the allegation of child neglect, there were now also concerns about

emotional and verbal abuse.  Harris continued to explain that if the judge decided that JKW should remain in placement, the case would be handed over to an ongoing social worker, there would be a "Child in Need of Protection and Services" ("CHIPS") hearing, and the Webers could also request a trial.  The Webers disputed the allegations, but again declined to take a drug test.

Also, still on May 14, an assistant district attorney filed a Petition for Protection or Services in Pierce County Circuit Court.  (Dkt. #53-15.)  Harris also submitted a Temporary Physical Custody ("TPC") Request and a Uniform Child Custody Jurisdiction and Enforcement Act Affidavit.  (Dkt. ##53-16, 53-17.)  Through their then counsel, the Webers filed a motion to deny TPC and dismiss the proceedings.  (Dkt. #53-21.)  Among other things, the Webers argued there was a lack of direct evidence of neglect; the department was prohibiting contact with JKW and had compromised her safety; the Webers had been coerced into signing the original protective plan; the county had requested "an illegal police hold" in Fridley; and the petition itself was full of errors, and asked the court to consider all of the family's circumstances.  (*Id.*)  At the TPC hearing on May 18, 2020, the Webers were represented by counsel and contested placement.  After hearing testimony from Harris and Mrs. Weber, including cross-examination, as well as testimony from Mr. Weber, and after questioning JKW, the court found probable cause to support the placement and signed the petition.  (Dkt. #53-20.)  The order also included among "[o]ther conditions of custody" that:  (1) contact between JKW and her parents would be supervised by the department going forward, and (2) the Webers would submit to drug testing as requested by the department.  (Dkt. #53-22 at 3.)

After the TPC hearing, however, Harris attests that JKW was nearly 18 by that point, so Harris would not force contact with the Webers.  On May 26, the Prescott Police Department dispatched officers in response to a call from JKW's work reporting that her father had come in and wanted to say hi to his daughter in violation of the TPC order, and JKW had hidden in the bathroom.  (Dkt. #63-3 at 4.)  That same day, JKW, through her attorney, filed a motion for a no contact order against her parents and for a date during which she could secure her belongings from her parents' home.  (Dkt. #63-4.)  On June 9, JKW's case was transferred to Ongoing Social Worker Stephanie Olsem.

Two days later, the Webers filed a second motion to dismiss that incorporated by reference their previous motion, as well as argued that the court was without statutory authority to proceed.  (Dkt. #53-24.)  The Webers next appeared at a CHIPS plea hearing and entered "denial pleas."  (Dkt. #63-4.)  The Webers further filed an amended motion to dismiss on June 24, arguing that Harris had failed in her duties and that the court lacked statutory authority to proceed, as well as purporting to incorporate by reference the arguments from their initial motion.  (Dkt. #63-6.)

On June 26, the Pierce County Circuit Court held a scheduling conference in the matter, and the judge took up the Webers' motions to dismiss.  The judge rejected the Webers' statutory authority argument, and noted that with respect to the Webers' challenge to probable cause, it would be difficult to overcome the previous judge's probable cause finding, while still setting a motion hearing for July 14.  In anticipation of that hearing, the Webers also filed a "clarification of motion to dismiss" on July 10, 2020, reiterating that:  there was no evidence of neglect; Harris did not comply with her

investigative duties; the department interfered with Mr. Weber's attempt to bring JKW home from Minnesota even though the department no longer had jurisdiction; and the department had interfered with the Webers' parental rights.  (Dkt. #53-25.)

At the motion hearing, the judge heard argument from the Webers' lawyer, as well as testimony from Stephanie Olsem and Mr. Weber.  Mr. Weber testified about his attempts to get JKW from her boyfriend's parents' house and then from her sister's home in Minnesota, as well as the complaints the Webers had filed with the Department about JKW's continued out-of-home placement.  After cross-examination the judge denied the Webers' motion, finding that:  (1) JKW was in the custody of Pierce County as of May 14; (2) the prior judge had found probable cause for neglect and to take JKW into custody; (3) there was probable cause; and (4) the TPC petition was not insufficient on its face.  The judge then scheduled a trial.  Finally, on July 31, the Webers filed a motion for reconsideration of the denial of their motion to dismiss, attaching the Fridley police report. (Dkt. #53-27.)  Before that motion was ruled on by the juvenile court, however, the juvenile case was dismissed on the ground that JKW had turned 18, so jurisdiction no longer existed.  (Dkt. #53-28.)


## OPINION

The court has done its best to identify plaintiffs' possible claims based on a generous reading of their amended complaint and the parties' briefing, and in light of Mrs. Weber's deposition, where she clarified the claims plaintiffs intended to pursue against each defendant.  (Dkt. ##53-9, 53-10.)  As this case has proceeded, the nature and the number of plaintiffs' claims has been a moving target, with plaintiffs seemingly adding claims even

in their summary judgment briefing without seeking leave to amend their complaint.  For example, plaintiffs do not reference equal protection, the right to an impartial jury, or conditions of confinement in their amended complaint, but do so in their brief in support of summary judgment or even for the first time in their reply.  (Dkt. ##80-1 at 11-13, 15, 141 at 14.)  Moreover, in support of their claims, plaintiffs:  (1) often make conclusory assertions about defendants collectively, (2) provide excerpts from caselaw or legal standards and elements without linking this information to any facts in this case, or (3) assert claims personal to JKW, such as a denial or delay of medical treatment, despite JKW not being a party.  (Dkt. #80-1.)  Although plaintiffs try for more clarity as to their claims in reply at summary judgment (dkt. #141), that is obviously not the place to assert yet more claims.  Thus, while the court has reviewed the record and briefing mindful of plaintiffs' *pro se* status, it would be prejudicial to defendants to allow plaintiffs to assert claims now that were not included or fairly discernable in the amended complaint, as the court already noted in a prior order.  (Dkt. #86 at 4.)

That said, plaintiffs' claims can be fairly summarized as follows.  First, they assert a *Monell* claim against the Pierce County Human Services Department.  Second, plaintiffs assert claims based on Officer Desjardins' decision to execute a hold on JKW, rather than let her leave with Mr. Weber, and arising under:  (1) the Fourth Amendment right to be free from unreasonable seizure; (2) the Fourteenth Amendment rights of substantive and procedural due process; and (3) Minn. Stat. § 609.26, a Minnesota state criminal statute which prohibits the deprivation of parental rights.  Third and finally, plaintiffs assert several claims against the individual Pierce County defendants based on their roles in

JKW's removal from plaintiffs' home and the related juvenile proceeding, including: (1) the First Amendment right to familial association and freedom from retaliation; (2) the Fourth Amendment right to be free from unreasonable search and seizure; (3) the Fifth Amendment right not to be compelled to be witness against oneself; (4) the Sixth Amendment; and (5) the Fourteenth Amendment rights of substantive and procedural due process.

A party is entitled to summary judgment if the movant shows that there is no genuine dispute as to any material fact, and judgment is appropriate as a matter of law. Federal Rule of Civil Procedure 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Material facts" are those that "might affect the outcome of the suit." *Anderson*, 477 U.S. at 248. If the moving party makes a showing that the undisputed evidence establishes their entitlement to judgment beyond reasonable dispute, then to survive summary judgment, the non-moving party must provide contrary evidence "on which the jury could reasonably find for the nonmoving party." *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 406-407 (7th Cir. 2009) (quoting *Anderson*, 477 U.S. at 252). There is an additional qualifier in cases where, as here, audio and video evidence are available: "to the extent [a plaintiff's] story is 'blatantly contradicted' by the video such that no reasonable jury could believe it, we do not credit his version of events." *Dockery v. Blackburn*, 911 F.3d 458, 461 (7th Cir. 2018) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)); *Conner v. Vacek*, 806 F. App'x 485, 487 (7th Cir. 2020) ("We credit Conner's version of events to the extent that it is supported by admissible evidence and is not clearly contradicted by the video and audio recording of the episode."). Most of plaintiffs' asserted

claims have little or no merit on their face, but the court will address them in the order set forth above.

## I.     Pierce County Department of Human Services and the Fridley Police Department

As an initial matter, the court will address plaintiffs' *Monell* claim against defendants Pierce County DHS and the City of Fridley, Minnesota Police Department.  Section 1983 allows a plaintiff to sue a "person" who violates his constitutional rights under color of state law.  However, neither of the named governmental departments is a person, nor a suable entity separate from the respective county or city government they serve.  *See Whiting v. Marathon Cnty. Sheriff's Dep't*, 382 F.3d 700, 704 (7th Cir. 2004) (the Marathon County Sheriff's Department is not a legal entity separable from the county government and is therefore not subject to suit).

In fairness, there are some circumstances in which municipalities or local governments can be considered "persons" and sued under § 1983.  *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978).  Even if plaintiffs had sued Pierce County or the City of Fridley, however, the only liability that could proceed against either under *Monell* would require proof that the harm plaintiffs suffered resulted from a broader policy or custom, rather than from the discretionary actions of individually named employees of those governmental bodies.  *See Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372, 379 (7th Cir. 2017) (en banc) ("The central question is always whether an official policy, however expressed . . . caused the constitutional deprivation").

In this case, plaintiffs have not alleged, much less proffered proof of any policies or customs of the Fridley Police Department or the City of Fridley that caused their claimed injuries.  As for Pierce County DHS, plaintiffs at least claim that the individual defendants' alleged conduct in this case *is* indicative of an unlawful custom or policy.  Specifically, they claim the county adopted a custom or policy that presumes a parent's "drug abuse equals neglect," while in plaintiffs' view it is a stereotypical and dangerous to assume that anyone who "does drugs . . . neglects their children."  (Dkt. #141 at 13.)  In support, plaintiffs rely on a 2020 statistic indicating a higher-than-average rate of child maltreatment substantiations in Pierce County, despite its wealth and below-average crime rate, to suggest that Pierce County's child protective services staff must be overzealously infringing on many families' rights.  (*Id.* at 34.)  However, a dubious syllogism based on one, general statistic and the underlying, specific events of this case are insufficient "evidence of a prior pattern of similar constitutional violations" to create a genuine dispute of fact.  *See Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 234 (7th Cir. 2021) ("it is usually necessary in *Monell* cases to introduce evidence of a prior pattern of similar constitutional violations").  Therefore, plaintiffs' claims against the county and city, as well as their named departments, must be dismissed.

## II.    Pierce County Defendants

The individual Pierce County defendants are also entitled to summary judgment on plaintiffs' First and Fourteenth Amendment claims against them.  Specifically, plaintiffs allege that Initial Assessment Worker Harris retaliated against them for complaining to Ron Schmidt about Harris and her investigation, prompting her to make false statements

and build a false case for removal of JKW from their home and ultimately for placing JKW into protective custody.[4]  However, their primary claim is that she and the other individual Pierce County defendants denied them substantive due process, and plaintiffs assert various violations against these defendants scattershot throughout their summary judgment briefing.  (*See* dkt. ##115, 141.)

Foundational among these alleged violations is that Harris removed JKW from their custody without probable cause and without giving plaintiffs a choice.  Because of that decision, plaintiffs claim violations of their right to familial relations with their daughter that began a four-month ordeal.  *See Hernandez*, 657 F.3d at 478 ("The fundamental right to familial relations is an aspect of substantive due process").  To begin, plaintiffs fault JKW's placement with her allegedly unstable older sister, and JKW being allowed to drive to Minnesota under dangerous circumstances without contacting her parents.  To cover these alleged initial mistakes, the individual Pierce County defendants allegedly then worked to alienate JKW from her parents during an eventful time in her life, advised her not to contact plaintiffs, thwarted their participation in her medical care, and conspired with the City of Fridley police to prevent plaintiffs from retrieving their daughter in

---

[4] In addition to the grounds discussed below, defendant Ron Schmidt is also entitled to summary judgment due to plaintiffs' failure to allege or prove anything about his personal involvement in any of the alleged constitutional violations.  Indeed, the sole allegation against Schmidt is that he did not do enough in response to Mrs. Weber's May 4, 2020, email, but there is no dispute that Schmidt received *and* reviewed the email, then as the Director, delegated an investigation of and response to the email to his subordinates.  *Cf. Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009) (noting that "[p]ublic officials do not have a free-floating obligation to put things to rights" and "[b]ureaucracies divide tasks" so "people who stay within their roles" cannot be liable under § 1983 "for not being ombudsmen").  Since Schmidt did not ignore the email, and a defendant cannot be held liable under § 1983 merely for his supervisory role over others, the claims against Schmidt also fail.  *Kuhn v. Goodlow*, 678 F.3d 552, 555-57 (7th Cir. 2012).

Minnesota. Defendants also allegedly continued to lie about plaintiffs throughout the investigation and juvenile proceedings, presented false information and evidence to the state court, and drafted a permanent placement plan that included erroneous information and excluded anything positive about the Webers. In short, plaintiffs argue that instead of a fair, objective procedure, these defendants were biased and abused their authority, as well as used JKW as a pawn against her parents.

Although not coextensive, issue preclusion and the *Rooker-Feldman* doctrine "define the respect one court owes to an earlier judgment." *GASH Assoc. v. Village of Rosemont*, 995 F.2d 726, 728 (7th Cir. 1993). Generally, the *Rooker-Feldman* doctrine "bars a plaintiff from bringing a § 1983 suit to remedy an injury *inflicted* by the state court's decision," leaving the plaintiff to "pursue remedies through the state system until it seeks certiorari from the Supreme Court of the United States." *Jensen v. Foley*, 295 F.3d 745, 747 (7th Cir. 2002). By contrast, issue preclusion "applies when a federal plaintiff complains of an injury that was not caused by the state court, but which the state court has previously failed to rectify." *Id*.

Applying these principles here, plaintiffs claim injuries arising out of Initial Assessment Worker Harris's April 2020 brokering of a temporary protective plan between plaintiffs and their daughter, who apparently made claims, along with others, against her parents' treatment of her that Harris found credible, whether true or not. In her initial investigation of the complaint against plaintiffs, Harris interacted with JKW and her boyfriend, and Officer Desjardins, as well as plaintiffs, among others, and most relevant events took place during the approximately two weeks *before* the state court considered the

question of probable cause for JKW's removal.  Even so, "[i]ssue preclusion prevents a party from relitigating an issue that it has previously litigated and lost," and "[f]ederal courts must give state court judgments the same preclusive effect as would a court in the rendering state."  *Id.* at 748 (citation omitted).  In Wisconsin specifically, issue preclusion is appropriate if:  (1)"the issue or fact was actually litigated and determined in the prior proceeding"; (2) "the determination was essential to the judgment"; and (3) "applying issue preclusion comports with principles of fundamental fairness."  *Aldrich v. Labor and Indus. Review Comm'n*, 2012 WI 53, ¶¶ 97-98, 341 Wis. 2d 36, 814 N.W.2d 433.  The goals of issue preclusion "are to avoid repetitive litigation, conserve judicial resources, and foster reliance on judicial action by promoting finality of judgments and avoiding inconsistent decisions."  *Id.* at ¶ 103.

Plaintiffs do not genuinely dispute that they raised the same issues in state court while contesting JKW's removal during the state TPC hearing, the plea hearing, and the motion hearing.[5]  To the contrary, Mr. Weber *confirmed* at his deposition that plaintiffs were making the same arguments here and had "been pretty consistent all the way through this."  (Dkt. #53-5 at 32.)  Further, plaintiffs were represented by counsel in state court, who filed several motions to dismiss, arguing that: (1) there was no probable cause to remove JKW; (2) the Pierce County defendants were interfering with their fundamental rights as parents; (3) Harris coerced plaintiffs into signing the protective plan, allowed JKW

---

[5] In response to the Pierce County defendants' proposed findings of fact on this subject, plaintiffs assert that "[t]he allegations are sim[i]lar [between the state and federal cases] but there [are] some differences between them."  (Dkt. #137 at 171.)  Plaintiffs neither indicate what those differences are, nor explain why those differences are material to the question of issue preclusion.

to drive under dangerous circumstances to Minnesota, and directed Officer Desjardins to place an "illegal" hold on JKW; (4) the Department never substantively replied to Mrs. Weber's May 4 complaint and did not keep JKW safe under the protective plan; (5) that JKW's older sister was a negative influence; (6) the state court proceedings were retaliatory; and (7) the department was presenting false, erroneous documents to the state court, among other issues.  (Dkts. ##53-21, 53-24, 53-25, 53-27.)  Finally, *two different state court judges* addressed plaintiffs' motions and independently found probable cause, and plaintiffs did not seek leave to appeal the probable cause determination and the denial of their motions to dismiss.  *See* Wis. Stat. § 808.03(2) (stating the criteria for granting a request for leave to appeal).  Under these circumstances, a federal court has no option but to find plaintiffs are precluded from relitigating the same issues again in federal court, no matter how they are packaged as federal constitutional claims.  *See Foley*, 295 F.3d at 746 (finding that issue preclusion barred plaintiffs' constitutional claims arising out of the warrantless removal of their child).

Plaintiffs also claim injuries arising out of the state court's probable cause finding and TPC order itself, including continued separation from JKW, allowing only supervised contact with her resulting in police contact with Mr. Weber, and requests that they submit to drug testing.  These claims are even less viable under the *Rooker-Feldman* doctrine, which blocks federal district courts from hearing claims that a state-court judgment harmed a federal plaintiff.  *D.C. Court of Appeals v. Feldman*, 460 U.S. 462 (1983); *Rooker v. Fid. Tr. Co.*, 263 U.S. 413 (1923); *Foley*, 295 F.3d at 747-48.   "The doctrine also covers claims . . . that misstatements made to a state court produced a harmful judgment."  *Coley*

*v. Abell*, 682 F. App'x 476, 478 (7th Cir. 2017) (citing *Harold v. Steel*, 773 F.3d 884, 886-87 (7th Cir. 2014); *Kelley v. Med-1 Sols., LLC*, 548 F.3d 600, 605 (7th Cir. 2008)).  Thus, *Rooker-Feldman* bars plaintiffs' related claims that defendants' alleged lies to the state court led to the TPC order or that defendants' enforcement of the custody order led to plaintiffs' further alienation from JKW.  *See id.* (*Rooker-Feldman* barred plaintiff's claim that defendants' alleged lies to the state court led to the court's order that probable cause justified the removal of her children).

Finally, and alternatively, as to plaintiffs' claims that Harris, Olsem, Stensland and Wolf gave false testimony and presented reports and plans to the state court that were rife with factual errors and omissions, the Seventh Circuit has held that "social workers and like public officials are entitled to absolute immunity in child custody cases on account of testimony and other steps taken to present the case for decision by the court."  *Millspaugh v. Cnty. Dep't of Pub. Welfare of Wabash Cnty.*, 937 F.2d 1172, 1176 (7th Cir. 1991); *see Pittman v. Cuyahoga Cnty. Dep't of Children and Family Servs.*, 640 F.3d 716, 723 (6th Cir. 2011) (absolute immunity for social workers "is akin to absolute immunity for prosecutors" so "the same protection must apply here, no matter how undesirable the results").  That is because a plaintiff's alleged injuries arise from *the court's use* of such evidence in rendering its decision, not from its existence.  *E.g., Pelham v. Albright*, No. 3:11-cv-99, 2012 WL 1600455, at *6-7 (N.D. Ind. May 4, 2012) (dismissing plaintiffs' claims against a state attorney and department of child services worker who allegedly "participated in a conspiracy to place false testimony and information known to be false before a court," because "[a]bsolute immunity clearly protect[ed] these defendants from a lawsuit based on

30

these alleged acts); *Rangle v. Reynolds*, 607 F. Supp. 2d 911, 921-22 (N.D. Ind. 2009) (dismissing the plaintiffs' claim that social worker submitted false and misleading courtroom testimony and false documentation to the court because the social worker was entitled to absolute immunity for those actions under *Millspaugh*); *Ibitayo v. McDonald*, No. 03-c-3362, 2003 WL 22765046, at *4 (N.D. Ill. Nov. 20, 2003) (dismissing claim on absolute immunity grounds against social worker who prepared and presented report regarding the plaintiff's family that was allegedly rife with errors and omissions); *Hebein ex rel Berman v. Young*, 37 F. Supp. 2d 1035, 1047 (N.D. Ill. 1998) (dismissing the plaintiff's claim that social workers falsely testified during a wardship proceeding because the social workers were afforded absolute immunity under *Millspaugh*).

For all these reasons, the individual Pierce County defendants are entitled to summary judgment in their favor on plaintiffs' First Amendment and Fourteenth Amendment substantive due process claims.

## III.    City of Fridley Police Officer Desjardins

The court understands plaintiffs to also be claiming that Officer Desjardins violated their Fourteenth Amendment substantive due process right to familial integrity by not allowing JKW to return to Wisconsin with Mr. Weber, even though the agreement in place at that time was voluntary, and placing a hold on her.[6]  Desjardins argues that his conduct

---

[6] Plaintiffs also assert in reply that defendants' "documentation is littered with flat out lies, and negative inferences" about them, but do not provide specific examples of what they mean.  (Dkt. #141 at 29.)  As for plaintiffs' claim in reply that Desjardins had a "ministerial duty" to return JKW (*id.* at 31), plaintiffs do not explain what they mean by "ministerial duty" or provide any law in their reply brief that would govern the analysis.  Regardless, the officer's actions here were discretionary.  *See Vassallo ex rel. Brown v. Majeski*, 842 N.W.2d 456, 462 (Minn. 2014) (a

was both constitutional and subject to the defense of qualified immunity.  That doctrine "protects government officials from damages liability 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Campbell v. Kallas*, 936 F.3d 536, 545 (7th Cir. 2019) (quoting *Estate of Clark v. Walker*, 865 F.3d 544, 549-50 (7th Cir. 2017)).  Constitutional law is "clearly established" if it is found in Supreme Court precedent, controlling circuit court authority, or "a consensus of persuasive authority such that a reasonable [government official] could not have believed that his [or her] actions were lawful." *Wilson v. Layne*, 526 U.S. 603, 617 (1999).  "[T]he Supreme Court has repeatedly emphasized that the clearly established law must share specific details with the facts of the case at hand." *Doxtator v. O'Brien*, 39 F.4th 852, 863 (7th Cir. July 12, 2022).

In child protection cases, the qualified immunity defense can be difficult to overcome "because the balance between a child's liberty interest in familial relations and a state's interest in protecting the child is nebulous at best," so "social workers and other state actors who cause a child's removal are entitled to qualified immunity because the alleged constitutional violation will rarely—if ever—be clearly established." *Brokaw v. Mercer Cnty.*, 235 F.3d 1000, 1023 (7th Cir. 2000) (collecting cases); *see also K.D. v. Cnty. of Crow Wing*, 434 F.3d 1051, 1055 (8th Cir. 2006) (citation omitted) (qualified immunity defense is "difficult to overcome" in child protection context and it is "nearly impossible to separate the constitutional violation analysis from the clearly established analysis")

---

"discretionary duty involves individual professional judgment that necessarily reflects the professional goal and factors of a situation").

Here, Officer Desjardins made his decision based on several factors.  For one, the officer spoke with JKW herself, who was mentally competent and at that time nearly 18 years old, about her own safety concerns, and with JKW's older sisters.  The officer also reviewed the protective plan, which corroborated JKW's and Pierce County's concern about drug use, noted that Mr. and Mrs. Weber had signed the plan but had refused drug testing, *and* that JKW's older sisters had been designated as the protective providers, as had the Fridley address where JKW was found.  As far as the plan's status, the officer received conflicting information, and Mr. Weber acknowledged at his deposition that the officer could have been confused as to who to believe.  (Dkt. #56 at 15 ("Yeah, there is evidence here stating that he could be confused.").)  In addition, Mr. Weber had obviously appeared unannounced at night, stating that he was cancelling the voluntary plan and that the Webers had been cleared, and he wanted his daughter back, who was unwilling to go.  Finally, the officer spoke with two Pierce County workers, who were unaware of Weber's change of position and who strongly advised that it was not safe for JKW to return with Weber as plaintiffs were not cooperating with the County's investigation.[7]

In the end, Officer Desjardins sent Mr. Weber home with the impression that Initial Assessment Worker Harris would be in touch with the family the next day, and after further investigation clarifying that Pierce County had no hold on JKW, and that Pierce County lacked jurisdiction given her presence in Minnesota, Desjardins sought advice from

---

[7] The protective plan itself states that while it is voluntary, participants who "no longer agree to the plan should contact [their] worker immediately" because "changes can be made."  (Dkt. #53-6 at 4.)

his local county services before verifying that her older sister did not have an arrest record and placing a 72-hour hold on JKW.

Because Desjardins is a Minnesota police officer who performed all actions relevant to this case in that state, he argues that a reasonable officer in his position is expected to act according to law clearly established in the Eighth Circuit.  In that circuit, where a state actor "takes an action which would otherwise unconstitutionally disrupt familial integrity, he or she is entitled to qualified immunity, if such action is properly founded upon a reasonable suspicion of child abuse."  *Stanley v. Finnegan*, 899 F.3d 623, 627 (8th Cir. 2018) (citation omitted).[8]  Defendants also point to *K.D.*, in which the Eighth Circuit affirmed the grant of qualified immunity to officers who put a police hold on a child due to safety concerns related to alleged drug abuse and trafficking by K.D.'s mother.  434 F.3d at 1056-57.  That court explained "[t]he relatively limited intrusion into the familial relationship was not so disproportionate to the potential risk to K.D.'s well-being as to rise

---

[8] The Seventh Circuit similarly requires in the context of substantive due process that caseworkers have a reasonable suspicion of past or imminent abuse before taking a child into protective custody. *E.g.*, *Siliven v. Indiana Dep't of Child Servs.*, 635 F.3d 921, 928 (7th Cir. 2011).  As already noted, the Seventh Circuit has held as a general proposition in cases claiming governmental interference with the right of family integrity that "social workers and other state actors who cause a child's removal are entitled to qualified immunity because the alleged constitutional violation will rarely—if ever—be clearly established." *Brokaw*, 235 F.3d at 1023.  An exception exists where governmental actions "are so clearly beyond the pale that a reasonable person should have known of their unconstitutionality even without a closely analogous case." *Id.*  For example, where police officers in plain clothes and an unmarked car entered a home and carried two children away without explanation, causing the parents to call police and report a kidnapping, and placed the children in foster care as part of a conspiracy to "destroy the family, based simply on the family's religious beliefs." *Id.* at 1007, 1022-23 (rejecting qualified immunity defense at the motion to dismiss stage because defendants' alleged conduct was "so severe that a reasonable person would have understood that he was violating [the child's] constitutional rights").  Even if Seventh Circuit case law were relevant to Office Desjardins' actions in Minnesota, therefore, the allegations against him do not even begin to rise to this level.

to the level of a constitutional violation." *Id.* at 1057.  So, too, in *Manzano v. South Dakota Department of Social Services*, 60 F.3d 505 (8th Cir. 1995), the Eighth Circuit reversed the denial of qualified immunity to social services workers.  Even though their sexual abuse investigation based on a child's allegations was "far from textbook perfect," the child's father had "not come forward with evidence sufficient to create a genuine issue of material fact as to any official action which, if proven, would establish a constitutional violation of the right to familial integrity." *Id.* at 514-15.  By contrast, Desjardins also references *Whisman through Whisman v. Rinehart*, 119 F.3d 1303 (8th Cir. 1997) where the circuit affirmed the denial of qualified immunity to government officials who removed a child based on a babysitter's report that the mother had not picked up the child and third-hand hearsay that the mother was at home "passed out drunk." *Id.* at 1307.

Plaintiffs do not identify clearly established precedent in either the Seventh Circuit or the Eighth Circuit that would have put Officer Desjardins on notice that Desjardins' use of a 72-hour police hold was unlawful.  *See Smith v. Finkley*, 10 F.4th 725, 737 (7th Cir. 2021) (once the defense of qualified immunity is raised, it becomes plaintiff's burden to defeat it).  Rather, plaintiffs suggest without evidence that the officer "maliciously conspire[d]" with Harris and acted in general with improper motives, and claim that the officer acted unprofessionally around their daughters.  (Dkt. #141 at 29.)  Plaintiffs also argue that Officer Desjardins should have credited Mr. Weber's version of events given the voluntary nature of the safety plan, and once the officer knew for certain there was no hold on JKW, he should have called Mr. Weber to come back and pick up JKW.  However, the Webers' parental rights were not absolute, and as discussed above, a 72-hour police hold

is considered a "relatively limited intrusion into the familial relationship," at least if based on more than third-hand hearsay.  *K.D.*, 434 F.3d at 1057.

Accordingly, that plaintiffs retained their parental rights under the voluntary plan and wanted to withdraw from the plan, or that the hold was supported by Pierce or Anoka County workers, is insufficient to create a genuine dispute of material fact as to whether Officer Desjardins had a basis for reasonable suspicion of abuse based on all of the information he had at the time.  Nor will plaintiffs' speculation and conjecture defeat summary judgment.  *Weaver v. Speedway, Inc.*, 28 F.4th 816, 820 (7th Cir. 2022) (inferences supported by only speculation and conjecture will not defeat a summary judgment motion). Nor can accusations of "evil intent" (dkt. #115 at 1) or improper motives rebut the assertion of qualified immunity.  *See Crawford-El v. Britton,* 523 U.S. 574, 588 (1998) ("[e]vidence concerning the defendant's subjective intent is simply irrelevant" when evaluating the availability of the qualified immunity defense).  Thus, Officer Desjardins is entitled to qualified immunity and summary judgment will also be entered in his favor.


## IV.    Remaining Claims

Finally, the court will dismiss plaintiffs' First Amendment familial or intimate association claims, their Fourth, Fifth, and Sixth Amendment claims, their procedural due process claims, and their Minnesota state law claim, because all fail as a matter of law. Plaintiffs allege that the Pierce County defendants violated their First Amendment right to intimate association with their daughter by removing and keeping JKW from their home. The freedom of *expressive* association falls within the First Amendment and "ensures the

right to associate for the purpose of engaging in activities protected by the First Amendment." *Montgomery v. Stefaniak*, 410 F.3d 933, 937 (7th Cir. 2005).  However, the Due Process Clause of the Fourteenth Amendment protects the freedom of *intimate* association, which is the right to enter into and maintain certain intimate human relationships and receives protection as "a fundamental element of personal liberty."  *Id.* (quoting *Roberts v. United States Jaycees*, 468 U.S. 609, 617-18 (1984)).  Accordingly, defendants are entitled to summary judgment on plaintiffs' First Amendment familial or intimate association claim.

Plaintiffs also allege all defendants violated their Fourth Amendment rights by unreasonably seizing JKW from their home, and in the case of Officer Desjardins, preventing Mr. Weber from taking JKW from her sisters' home.  (Dkt. ##53-10 at 4, 58 at 27-28.)  However, that Fourth Amendment right may only be asserted by *the child* who is removed from the home.  *Brokaw*, 235 F.3d at 1018.  Here, JKW is not a party asserting the right, nor apparently does she wish to assert her Fourth Amendment rights now as an adult.  Because plaintiffs were not seized, their claims based on the removal of JKW are "properly analyzed under substantive due process," not the Fourth Amendment.  *Hernandez ex rel. Hernandez v. Foster*, 657 F.3d 463, 474 (7th Cir. 2011).

Plaintiffs' claim that the request for a drug test constituted an unreasonable search also fails.  They refused to submit to drug testing throughout the juvenile court proceedings, so no "search" ever occurred.  *See Coleman v. State of New Jersey Div. of Youth & Fam. Servs.*, 246 F. Supp. 2d 384, 392 (D.N.J. 2003) ("Since Coleman did not give

consent to the caseworkers to conduct a drug test, and because no drug test was conducted, there was no search.").

Mrs. Weber next contended at her deposition that the Pierce County defendants violated plaintiffs' Fifth Amendment right to be free from self-incrimination by trying to force plaintiffs to submit to drug and psychological testing, as well as their Sixth Amendment "right to not have hearsay [used] against you" by basing the removal of JKW on nothing but hearsay. (Dkt. #53-9 at 111-114.) As an initial matter, plaintiffs' claims arise from the underlying juvenile proceedings, not any criminal proceedings. *See* U.S. Const. amend V ("[no] person. . . .shall be compelled in any criminal case to be a witness against himself"); U.S. Const. amend VI ("In all criminal prosecutions, the accused shall enjoy the right . . . "). Moreover, whatever its evidentiary value, the Sixth Amendment does not guarantee a right to be *free* from "hearsay," and plaintiffs never submitted to drug or psychological testing, so to the extent any results could be considered "statements" under the Fifth Amendment, no such "statements" were ever used against them. *See Chavez v. Martinez*, 538 U.S. 760, 766 (2003) (defendant could not allege a Fifth Amendment violation "since [he] was never prosecuted for a crime," nor were his statements "admitted as testimony against him in a criminal case"). Thus, defendants are also entitled to summary judgment on plaintiffs' Fourth, Fifth, and Sixth Amendment claims.

Plaintiffs further claim that they were denied procedural due process in the absence of being afforded a formal hearing before: (1) they were asked to sign the protective plan on April 30, 2020; (2) Officer Desjardins continued to hold JKW on May 11; and (3) she was taken into temporary physical custody by Pierce County and placed in a foster home

on May 14.  Certainly, familial relations "is a protected liberty interest."  *Brokaw*, 235 F.3d at 1020.  In this context, however, procedural due process requires that "parental rights [not] be denied without an *opportunity* for them to be heard at a meaningful time and in a meaningful manner."  *Id.* (citation omitted) (emphasis added).  Here, plaintiffs signed the voluntary protective plan on April 30, and "no hearing of any kind is necessary; hearings are required for deprivations ordered over objection, not for steps authorized by consent." *Dupuy v. Samuels*, 465 F.3d 757, 761-62 (7th Cir. 2006).  Nevertheless, plaintiffs now contend that they were "coerced" into signing the plan because JKW could otherwise have been taken into temporary physical custody; plus, they complained during the County's home visit about their unfair treatment, and feeling like they had no rights.  However, the Webers plainly knew they still had their custodial rights, had talked about the possibility of JKW leaving even before Harris and Bauer's visit, and had already agreed to "pack her bags and let her go."  (Dkt. #53-3 at 17.)  Mr. Weber even repeatedly *suggested* that JKW be placed into protective custody before relenting and signing the less restrictive, voluntary safety plan.  Regardless, Harris and Bauer advising that JKW would be placed in protective custody was not done without basis:  (1) a complaint had been made; (2) Harris had spoken with JKW and her boyfriend, who corroborated allegations in the complaint, and (3) the Webers were refusing to take a drug test.  *See id.* (coercion is objectionable when illegal means are used to obtain a benefit).  Finally, the Seventh Circuit already rejected the argument that "the state 'coerces' agreement to safety plans by threatening to remove the child from his parents' custody unless they agree to the plan."  *Id*. at 762.

That leaves the events of May 11 and May 14.  As for Officer Desjardins' decision to place a police hold on JKW on the evening of May 11, rather than allow her to return home with Mr. Weber, Minnesota law prescribes a hearing within 72 hours of a police hold if the child remains in custody.  Minn. Stat. § 260C.176.  There is *no* allegation that JKW was in the custody of the Fridley defendants or Anoka County Social Services for more than 72 hours.  Indeed, by the morning of May 14, JKW was already in the temporary physical custody of Pierce County and had been placed in a foster home.  Further, plaintiffs then were afforded a post-removal hearing within two business days, at which plaintiffs participated with counsel before a Pierce County Circuit Court Judge, who found probable cause for removal.  *See* Wis. Stat. § 48.21(1)(a) (hearing must be held within 48 hours of the child being taken into custody in CHIPS cases, excluding weekends and holidays); *see also Brokaw*, 235 F.3d at 1021 (constitutionally-adequate, post-deprivation hearing establishing probable cause prevents due process claims for lack of a pre-deprivation hearing); *Foley*, 295 F.3d at 747 (procedural due process is satisfied when a post-deprivation hearing is held within the statutorily required period).

Finally, plaintiffs' state law claim against the City of Fridley defendants for depriving Mr. Weber of his parental rights also fails as a matter of law.  Minnesota law criminalizes *abduction by noncustodial parents and relatives*, Minn. Stat. § 609.26, while the Minnesota Supreme Court has declined to create a tort of custodial interference based on a violation of that statute.  *Larson v. Dunn*, 460 N.W.2d 39, 47 (Minn. 1990) ("Expanding

the adversarial process to include this new tort is contrary to the best interests of children").

Accordingly, there is *no* civil action in tort for violating this Minnesota statute.[9]

### ORDER

IT IS ORDERED that:

1) Plaintiffs' motion to produce (dkt. #90) is DENIED.

2) Plaintiffs' cross-motion for summary judgment (dkt. #72) is DENIED.

3) Defendants' cross-motions for summary judgment (dkt. ##51, 61) are GRANTED.

4) The clerk of court is directed to enter judgment in defendants' favor and to close this case.

Entered this 8th day of September, 2022.

BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge

---

[9] To the extent plaintiffs wish to pursue state law claims in addition to their claim under Minn. Stat. § 609.26 -- for example, they reference defamation in their brief in support of their cross-motion (dkt. #80-1 at 6) -- the court declines to exercise supplemental jurisdiction over any state law claims without any viable federal claims, and leaves plaintiffs to pursue such claims in the appropriate state court, subject to the applicable state statute of limitations. *See Coleman v. City of Peoria, Illinois*, 925 F.3d 336, 352 (7th Cir. 2019) (district courts will generally relinquish supplemental jurisdiction over state law claims if all federal claims have been resolved before trial).